UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**F I L E D**

JUL 1 5 2008

Jul 15, 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| CARL E. SANDERS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 08 CV 1660 |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF HOUSING & URBAN | ) | JUDGE: Hon. Matthew F. Kennelly |
| DEVELOPMENT SECRETARY, | ) | |
| ALFONZO JACKSON; VERONICA | ) | JURY DEMAND |
| COLEMAN; KENNETH R. DONOHUE | ) | |
| | ) | |
| Defendant, | ) | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT

Carl E. Sanders as a Pro Se Plaintiff, now comes before this Court and Complains

of the Department of Housing and Urban Development and the United States

Government, as follows:

### I.

### JURISDICTION, VENUE AND CONDITIONS PRECEDENT

1.    Plaintiff resides at 206 Dogwood Street, Park Forest, Illinois 60466, and is

a resident of the Eastern Division of the Northern District of Illinois.

2.    The claims herein are brought against the United States pursuant to the

Federal Tort Claims Act (28 U.S.C. Section 1346 (b)(1), for money damages as

compensation for loss of property and work opportunities that was caused by the

negligent and wrongly acts and omissions of employees of the Department of Housing

and Urban Development ("HUD") while acting within the scope of their offices and

employment, under circumstances were the United States, if a private person, would be liable to Plaintiff in accordance with the tortuous interference with a business relationship case law in the State of Illinois.

3.     Venue is proper in that all of the acts and omissions forming the basis of these claims occurred in the Eastern Division of the Northern District of Illinois, and arose from the tortuous interference with a business and employment relationship of Plaintiff by the actions of HUD employees within the Eastern Division of the Northern District of Illinois.

4.     Plaintiff has fully complied with the provisions of 28 U.S.C., Section 2675 of the Federal Tort Claims Act by filing a claim on these facts with the HUD Office of the Inspector General in August 2005, February 2007 and March 2008 (**Exhibits A, B and C**).

5.     This suit has been timely filed.  Plaintiff has served notice of this cause of action with HUD in August 2005. The HUD Inspector General assumed responsibility for processing this claim.  However, in spite of numerous telephone calls and letters from me, and letters to the HUD Inspector General by Illinois Senators and my Congressman (**Exhibits D, E and F**), no meaningful responses to my claim have ever been made by HUD.  It has now been nearly three (3) years since my claim has been filed with the HUD Inspector General and no final decision on my claim has been made by HUD.

## II.

## EVENTS FORMING THE BASIS OF THE CLAIM

**The Background Between Plaintiff and Ms. Coleman at South Pointe Towers**

6.    Plaintiff has been successfully employed in real estate sales and property management in the Chicago area for more than 30 years in various positions: Sales Agent, Property Manager, District Manager and Associate Director of Property Operations.

7.    Many of the "affordable" or HUD housing developments for which Plaintiff had responsible were in tough inner city neighborhoods were gang activity was high, drug crimes were epidemic, and these antisocial street behaviors tended to migrate into the properties themselves.

8.    Because Plaintiff had experience with these types of difficult properties, Plaintiff was hired by the P.M. One Limited Management Company ("PM One"), a Michigan-based corporation, to supervise its Chicago portfolio of difficult properties in September 1996.

9.    Plaintiff assumed responsibility for South Pointe Tower ("South Pointe"), a 22 story, 303 units, 100% Section 8 subsidized Tax Credit property in March 1998, and continued in that role through April 2001.

10.    South Pointe had been a very troubled property in HUD's portfolio since 1990. In 1998, HUD took the unusual step of referring South Pointe to the HUD Departmental Enforcement Center ("DEC"), HUD's specialized branch dealing with troubled projects which were connected to high crime, drug and gang controlled neighborhoods.

11.    Plaintiff was successful in working with the HUD DEC during the period from 1998 through 2000 so that a workout plan had been successfully developed and South Pointe was returned to HUD for normal loan processing.

12.    Because of the successful redevelopment plan developed by Plaintiff and the HUD DEC, HUD executed a four year Housing Assistance Payment ("HAP") contract with South Pointe in October 2000 so that there would be adequate financial resources to support a multiyear loan program to finance heightened security, resident lease enforcement, resident programs, and an extensive program of maintenance and repairs.

13.    HUD's Director of Management, Veronica Coleman, attempted to cancel the South Pointe 2000 HAP contract within two months of its execution, in December 2000, alleging that the contract was made in error and that it had been amended by the parties.

14.    In March of 2001, Ms. Coleman was part of the senior HUD management that improperly filed a Notice of Default against the Englewood Terrace Limited Partnership ("Englewood"), the owner of South Pointe, which Ms. Coleman felt was a sufficient reason to terminate the four year 2000 HAP contract after its first year.

15.    Later, in 2003, Englewood sued HUD for breach of contract in the Court of Federal Claims (case no. 03-2209C), for the improper termination of the four year HAP contract and for the defective Notice of Default.

16.    Plaintiff, along with a representative of the HUD DEC, was key witnesses for Englewood in its breach of contract suit against HUD.

17.    HUD filed a motion in December 2003 attacking the jurisdiction of the Court of Federal Claims to hear the case.  This motion was rejected in August of 2004.

18.    In 2005 and 2006 HUD filed two motions for summary judgment.  Both motions were rejected in 2006.

19.    Plaintiff filed a comprehensive Declaration of his testimony in 2005,

**(Exhibit G)**.

20.    A six day trial took place at the Dirksen Building at 219 South Dearborn

in January and February of 2007.

21.    On November 30, 2007, Judge Horn of the Court of Federal Claims

determined that HUD was liable for breach of contract, that Plaintiff and Englewood had

made good efforts to correct both the physical and social behavior problems at South

Pointe and that the HUD witnesses, including Ms. Coleman, were "not credible."

**Ms. Coleman's Remarks Resulted in Plaintiff Losing his Job with Mercy Housing:**

22.    In the fall of 2003, Plaintiff entered into employment discussions with

Grace Buckley and others with Mercy Housing, Inc. ("Mercy") of Denver, Colorado

about their intended acquisition of an affordable housing portfolio subsidized by HUD

Section 8 contracts in Chicago which was its initial investment in what was to be a long

term commitment to the Chicago affordable housing marketplace.

23.    In October of 2003, Mercy hired Plaintiff to be the area supervisor of their

new Chicago portfolio at $75,000 a year, plus benefits worth $10,000 a year for a total

compensation of $85,000 a year.

24.    In November of 2003, at a meeting between Mercy and HUD, Ms.

Coleman stated to the group that when Plaintiff held a similar supervisory position with

PM One that he had "messed up" that portfolio and Mercy would not be making a wise

choice to employ Mr. Sanders in a similar position with Mercy.

25.    After the meeting, Mercy asked Plaintiff to explain the remarks that Ms. Coleman had made at the meeting.  Plaintiff indicated the circumstances of his role in the relationship between Englewood and HUD described in paragraphs #9 - #15 above.

26.    Upon information and belief, Mercy had subsequent meetings and/or phone calls with Ms. Coleman at HUD concerning the work performance of Mr. Sanders and his qualifications to perform the work he had been hired to do with Mercy.

27.    While Ms. Coleman may have believed her views of Mr. Sanders to be accurate, in fact, she had no first hand basis for making those remarks. In her testimony in the case of *Englewood v. United States*, she conceded that she had never visited South Pointe and had no first hand knowledge of conditions there and that her opinion was exclusively based on statements made to her by her staff.

28.    Judge Horn, in making her decision that HUD was liable for breach of the South Pointe HAP contract, concluded that Mr. Sanders was credible in his testimony, and that Ms. Coleman and her principal source of information on South Pointe, Gwen Thomas, were "not credible."

29.    The negative statements made by Ms. Coleman to Mercy concerning the qualifications and performance of Plaintiff were made without foundation and in reckless disregard for the truthfulness or falsity of the statements.

30.    After the meeting at HUD involving Mercy, Plaintiff and Ms. Coleman, Mercy terminated its $85,000 employment agreement with Plaintiff.

**Ms. Coleman Prevented Plaintiff from Gaining Employment with American:**

31.    In May of 2005, Plaintiff was in the final stages of negotiating an apartment management employment agreement with American Apartment Management Company ("American") that would have been for a compensation package of $85,000.

32.    As part of its reference checking, the last stage in the employment negotiation process, American checked on Plaintiff's capacities with Ms. Coleman at HUD.

33.    Ms. Coleman gave American the same sort of negative reviews on the responsibility for "messing up" the performance of PM One properties in Chicago that it had previously given to Mercy, resulting in the loss of Plaintiff's employment with Mercy.

34.    After American had checked Plaintiff's references with HUD and received the negative, but false, statements concerning Plaintiff's work performance, American terminated their employment negotiations with Plaintiff.

**Ms. Coleman and HUD Have Continued to "Blackball" Plaintiff to This Day.**

35.    The most significant part of Plaintiff's work history has involved his management of Chicago/Midwest affordable housing developments.

36.    All to the work of PM One, Mercy and American involve subsidized rents achieved through HUD Section 8 contracts and the regular, largely subjective, evaluation of property performance by the Chicago HUD Management Department headed by Ms. Coleman.

37.    Ms. Coleman and others on her staff have been quite vocal in their negative evaluations of Plaintiff's work performance while at PM One.

38.    The net result of the interference of Ms. Coleman with Plaintiff's existing employment relationship with Mercy, and his prospective employment relationship with American, and her communications concerning Plaintiff's failings with PM One with other owners and management agents of HUD insured or subsidized housing throughout the Midwest have effectively eliminated any opportunity for Plaintiff to gain employment in the field in which has had his greatest experience.

**Plaintiff's Performance with PM One Were Vindicated in Englewood v. U.S.**

39.    There was nothing that Plaintiff could say to prospective employers concerning the excellent quality of his work with PM One at South Pointe and other PM One properties until HUD's liability was determined in the lawsuit by *Englewood v. U.S.*, and Plaintiff's work was vindicated and Ms. Coleman's position on the work quality of Plaintiff was rejected and she was found "not credible" as a witness.

**Ms. Coleman's Power Has Continued to Block Plaintiff's Employment Prospects.**

40.    Even the quality of Plaintiff's work was established in *Englewood v. U.S.* prospective employers have still been reluctant to employ Mr. Sanders in any work involving HUD subsidized affordable housing because of the discretionary power that Ms. Coleman has over owners and managers of affordable housing, and the multiple instances in which discretion is involved in HUD's decisions.

41.    The fact that Englewood prevailed in its breach of contract suit against HUD and the work of Plaintiff has been vindicated has not resulted in Plaintiff's ability to obtain employment in the affordable housing field. Rather, the fact of HUD's loss and the monetary damages suffered by Englewood have increased the efforts of Ms. Coleman and HUD to retaliate against Plaintiff for his important contributions to

Englewood's litigation success and has made it even more difficult to obtain

employment with affordable housing developers and management agents who depend

upon HUD insurance, subsidies and acts of discretion as critical elements of their

business.

## III.

## COUNT ONE

## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

42.    Plaintiffs incorporate by reference herein all allegations set forth
above.

43.    The acts and events set forth above constitute Tortuous
Interference with a business/employment relationship under the laws of the State
of Illinois.  Because these acts and events were undertaken and caused by HUD
and their employees and/or agents of the United States, the United States
Government is liable for all damages caused by such acts, as provided by 28
U.S.C., Section 2680(h).

## IV. DAMAGES

**Plaintiffs Has Suffered the Following Injuries for Which He seek Full
Compensation Under the Law**:

44.    $384,000 in loss wages and benefits;

45.    $ 37,700 in personal loans to survive;

46.    $ 18,300 in credit card loans to survive;

47.    The plaintiff request that the Court and/or Jury assess punitive
damages pursuant to Judge Richard A. Posner in Mathias v. Accor
Economy Lodging, Inc. and Motel 6 Operating L.P. (03-1010, 03-
1078), which allows punitive damages against defendant found to have
committed "willful and wanton conduct," because the defendant actions
were purposely and with malice and with the intent to injure and cause harm.

48.    Punitive damages for Emotional and Mental Distress; Humiliation
and Damage to Reputation for not less than $2,000,000.

## V. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff is entitled to damages from the United States, and He do hereby prey that judgment be entered in his favor and against the United States government as follows:

49.    Coast of this lawsuit, in the amount of $_____; plus,

50.    Amount of loss wages and benefits; survival and credit card loans of $440, 000; plus,

51.    Punitive damages as stated in numbers 47 and 48 above.

Respectfully Submitted

Carl E. Sanders            Date

Carl E. Sanders, Pro Se
206 Dogwood Street
Park Forest, IL 60466-1823
Voice: (708) 747-1008
Email: carlces@sbcglobal.net

EXHIBIT A

# CARL E. SANDERS

206 Dogwood Street
Park Forest, IL 60466-1823
Voice: (708) 747-1008
Fax:    (708) 747-6522
Email: carlces@wroldnet.att.net

August 30, 2005

**Certified Mail 7004 2890 0003 7209 1129**
Honorable Kenneth M. Donohue, Inspector General
U. S. Department of Housing & Urban Development
451 7th Street, S. W.
Washington, DC 20410

**Re:   HUD (Veronica Coleman) Illegally and Maliciously Defaming my
        Character and Blackballing me in the Industry**

Dear Mr. Donohue:

It has recently come to my attention that HUD (Veronica Coleman) has and still is
Illegally, Maliciously, Defaming, my Character and Blackballing me in the Industry. Ms.
Coleman's behavior is illegal, malicious and a violation of my Civil Rights as a United
State Citizen.

Her malicious comments and behavior fully resonated as I was being deposed in the
pending case, EGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited
Partnership, Plaintiff, v UNITED STATES OF AMERICA, and ALPHONSO
JACKSON, Secretary of the Department of Housing and Urban Development,
Defendants, No.03-2209C.

I am extremely angered and perplexed as to how HUD and its employees feel that they
have the authority to flat out lie and maliciously defame my character.  My perception
regarding this is that Ms. Coleman feels that she has absolute power because she is
working for HUD and no one can stop her.

The referenced case, No.03-2209C and the listed chorology of events will clearly
demonstrate how I have been damaged by Ms. Coleman.

Page 1

The chronology of events is as follows:

1. In October 2003, I acquired a position with Mercy Housing, Inc. as Associated Director of Property Operations. The portfolio that Mercy acquired was transferred from IHDA to HUD due to the fact that the property was taken to M-T-M through with OMAR.

2. A meeting was convened with Mercy Housing, HUD and OMAR in November 2003 to detail HUD and OMAR requirements. Attending for MH were: Grace Buckley, President Acquisition/Development; Eddie Muniz, Director of Development; Carl E. Sanders, Associate Director of Property Operations. Attending for HUD were: Veronica Coleman and Debbie Gray. Attending for IHDA was a female whose name I do not recall and I have discarded her business card. Attending for OMAR was a male who handled M-T-M for OMAR whose name I also do not recall and I have discarded his business card as well.

3. During Mr. Muniz's presentation, he mentioned that MH had hired Carl E. Sanders to oversee the operations here in Chicago. At that point, Ms. Coleman responded by saying "we are well aware of Mr. Sanders' performance; we know how he messed-up P M One."

4. After the meeting, Ms. Buckley asked me what Ms. Coleman's comment was all about. She also stated that Ms. Coleman had talked to her a few days before the meeting and asked who would the overseeing Mercy's portfolio and when she replied that I would, Ms. Coleman stated that Mercy was making a bad choice.

5. My immediate supervisor (Robert Prettyman) e-mails me regarding how the meeting went and I replied to his e-mail. Therefore, this situation is documented.

6. Ms. Buckley's e-mail is: gbuckley@mercyhousing.org. Mr. Muniz e-mail is: emuniz@mercyhousing.org.

   Mercy Housing, Inc.
   1999 Broadway, Suite 1000
   Denver, Colorado 80202
   (303) 830-3300

7. On March 31, 2005, I interviewed with Dave Negal, VP, American Apartment Management Co., Inc., for the District Manager Position of the Midwest Region, Chicago and Milwaukee. On May 3, 2005, I had a second interview with Patty Ownby, President AAMCI and Dave Negal. I was offered the position and I accepted. We also agreed to a starting date and a time. Also, I agreed to return the next day to show Mr. Negal some property on the Westside that needed a receiver. Also Ms. Ownby stated that she would talk to HUD (Veronica Coleman) to see if it was my fault that HUD had rescinded the contract in the above referenced case. Ms. Ownby also stated that she had a very good relationship with Ms. Coleman.

8. On May 5, 2005, Mr. Negal rescinded the job offer by telephone.

9. Mr. Negal stated rescinding the job offer was due to the way I answered the question as to whether I could run the property for several weeks without any staff if they walked-off the job. This is like asking "how many bubbles in a bar of soap or how far is it from here to there"?

10. I am certain that Ms. Ownby instructed Mr. Negal to rescind the offer after she had talked to Ms. Coleman and the bogus question was for the records and protect Ms. Coleman since she had aforementioned that she had a very good relationship with her.  Ms. Ownby would probably tell the truth under oath.

Ms. Ownby and Mr. Negal can be contacted as listed.

> Patty Ownby, President
> American Apartment Management Co., Inc.
> 900 S. Gay Street, Suite 1504
> Knoxville, TN 37902
> (865) 525-7500

Mr. Donohue, I have not talked to anyone from MHI or AAMC.  The referenced case **No. 03-2209C** proves that Ms. Coleman and Ms. Thomas (Project Manager) maliciously mess-up P M One…  And Ms. Coleman /HUD should be liable for **slandering my name, defaming my character and blackballing me in the industry**.

Sincerely,

Carl E. Sanders

Cc:    Legal file

Page 3

# CARL E. SANDERS

206 Dogwood Street
Park Forest, IL 60466-1823
Voice: (708) 747-1008
Email: carlces@sbcglobal.net

**EXHIBIT B**

February 8, 2007

**Certified Mail 7006 0100 0006 3963 0656**
Honorable Kenneth M. Donohue, Inspector General
U. S. Department of Housing & Urban Development
451 7th Street, S. W.
Washington, DC 20410

Re:     Enclosed letter dated August 30, 2005

Dear Mr. Donohue:

The enclosed letter (complaint) was sent to you by certified mail on August 30, 2005 and
to date, I have not yet heard from you.

As pointed out in the letter (complaint), I have been severely damaged by HUD
(Veronica Coleman).

Once again, I am requesting that you investigate this matter and see that I get justice.
Hopefully, you are not taking the same position Ms. Coleman seem to have taken: "HUD
is very powerful and it is nothing you can do if we decide to violate your rights." Is this
the reason you decided not to respond to my enclosed complaint?

It is expected that you will respond within the next 30 days.

Sincerely,

Carl E. Sanders

File

# CARL E. SANDERS

206 Dogwood Street
Park Forest, IL 60466-1823
Voice: (708) 747-1008
Email: carlces@sbcglobal.net

**EXHIBIT C**

March 7, 2008

**Certified Mail 7006 21500002 8436 9412**
Honorable Kenneth M. Donohue, Inspector General
U. S. Department of Housing & Urban Development
451 7th Street, S. W.
Washington, DC 20410

Re:    Case No. HL-07-2689

Dear Mr. Donohue:

I am responding to your letters to Representative Jessie L. Jackson Jr. dated August 20
and September 19, 2007 respectively regarding the subject case (HL-07-2689).

In the August letter, you stated that you would provide an interim response or a final
reply by November 1, 2007. In your September letter, your final paragraph stated:
"Finally, as stated in my August 20th letter, since he has not made allegations of fraud,
waste or abuse affecting the programs and operations, of HUD, I have forwarded Mr.
Sanders' request to the Office of Housing, and have asked it to review his allegations and
provide to me a report of its findings. I will apprise you when I have received the Office
of Housing's report, on or about November 1, 2007".

There seems to be no "report" from the Office of Housing as you promised in your
September 2007 letter. However, there is a letter from Mark A. Studdert, General Deputy
Assistant Secretary for Congressional and Intergovernmental Relations, which did not
reflect any "investigation," only a vague and general statement from HUD about standard
operating procedures. There were no information on what was investigated, who was
investigated, when the investigation took place and what was found out to justify the
essence of Mr. Studdert's letter. It is presumed that someone gave you a written report.
This being the case, would you please share this report with us?

The Judge in case No. 03-2209C (Ct. of Fed. Claims) found HUD employees not credible
in their testimony. In layman's terms, they "lied", not the types of people who can be
presumed to be telling the truth in their communications with Mr. Studdert. There was
no way for you to know this at the time. The decision in the Englewood case where

**Page 2**
March 7, 2008

Judge Horn made these comments was not made until November 30, 2007. This is at least a material new development that should justify a renewed and more careful/serious investigation of my claims.

I am profoundly mystified as to how a situation like mine – which appears to be standard operating procedure for HUD Chicago - can continue to receive this type of inattention. In light of what has taken place, it is requested that you reconsider your position on this matter.

Your prompt reply to this letter will be greatly appreciated!


Sincerely,

Carl E. Sanders

Cc:    Annette de Caussin                    Carrie A. Kagawa - By Email
       Director Constituent Services          Constituent Services Agent
       Congressman Jessie L. Jackson, Jr.     Senator Barack Obama
       17926 South Halstead Street            230 S. Dearborn, Suite 3900
       Homewood, IL 60430                     Chicago, IL 60604

       Drew Colbert - By Email
       Constituent Services Agent
       Senator Chris Dodd
       448 Russell Senate Office Building
       Washington, DC 20510

BARACK OBAMA
ILLINOIS

**United States Senate**

WASHINGTON, DC 20510

COMMITTEES:

HEALTH, EDUCATION, LABOR AND PENSIONS

HOMELAND SECURITY AND
GOVERNMENTAL AFFAIRS

FOREIGN RELATIONS

VETERANS' AFFAIRS

December 7, 2007

EXHIBIT D

Mr. Carl E. Sanders
206 Dogwood Street
Park Forest, Illinois 60466

Dear Mr. Sanders:

Thank you for your continued patience with Senator Obama's Chicago office as we work on your pending case.

I have submitted an inquiry to Illinois Department of Housing and Urban Development on your behalf. Our office will do its best to assure that you receive a response to your request.

Please allow thirty (30) to sixty (60) days for the agency to respond. Additionally, I will contact you as soon as we receive any information concerning your case. If in the mean time you have any questions, please feel free to contact our office at 312-886-3506.

Sincerely,

Carrie A. Kagawa
Constituent Services Agent

Office of U.S. Senator Barack Obama
230 S. Dearborn, Suite 3900
Chicago, IL 60604

**WASHINGTON OFFICE**
713 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20610
OFFICE (202) 224-2854
FAX (202) 228-4260

**CHICAGO OFFICE**
230 S. DEARBORN
SUITE 3900
CHICAGO, IL 60604
OFFICE (312) 886-3506
FAX (312) 886-3514

**SPRINGFIELD OFFICE**
607 EAST ADAMS
SUITE 1520
SPRINGFIELD, IL 62701
OFFICE (217) 492-5089
FAX (217) 492-5099

**MARION OFFICE**
701 NORTH COURT STREET
MARION, IL 62959
OFFICE (618) 997-2402
FAX (618) 997-2850

**MOLINE OFFICE**
1911 52ND AVENUE
MOLINE, IL 61265
OFFICE (309) 736-1217
FAX (309) 736-1233

RICHARD J. DURBIN
ILLINOIS

COMMITTEE ON APPROPRIATIONS

COMMITTEE ON THE JUDICIARY

COMMITTEE ON RULES
AND ADMINISTRATION

ASSISTANT MAJORITY
LEADER

**United States Senate**

**Washington, DC 20510—1304**

309 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510–1304
(202) 224–2152
TTY (202) 224–8180

230 SOUTH DEARBORN, 38TH FLOOR
CHICAGO, IL 60604
(312) 353–4952

525 SOUTH EIGHTH STREET
SPRINGFIELD, IL 62703
(217) 492–4062

701 NORTH COURT STREET
MARION, IL 62959
(618) 998–8812

durbin.senate.gov

August 1, 2007

Mr. Carl Sanders
206 Dogwood St.
Park Forest, IL  60466

EXHIBIT E

Dear Mr. Sanders:

Thank you for your recent inquiry to my office.  I have been informed of the nature of your concern and will do my best to assist you.

Kathleen Rooney, a Senate Aide in my Chicago office, assists me in matters such as these and will contact the HUD to make an inquiry.  I trust that this matter will receive prompt and complete consideration.

You will be contacted as soon as a response has been received.  We ask that you allow at least thirty (30) to sixty (60) days for a response.  However, if you have additional information or concerns relative to this matter, please feel free to contact my office at 312/353-4952.

Very truly yours,

Richard J. Durbin
United States Senator

230 South Dearborn St.
Suite 3892
Chicago, Illinois  60604
312/353-4952

RJD/kr

COMMITTEE ON APPROPRIATIONS

SUBCOMMITTEES:

LABOR-HEALTH AND
HUMAN SERVICES-EDUCATION

FOREIGN OPERATIONS, EXPORT FINANCING
AND RELATED PROGRAMS

# Congress of the United States
## House of Representatives
### Washington, DC 20515—1302

August 30, 2007

EXHIBIT F



Mr. Kenneth M. Donohue
Inspector General
U.S. Department of Housing and Urban Development
451 7th Street, S.W.
Washington, D.C. 20410

Dear Mr. Donohue:

This correspondence follows up your response to my letter on behalf of my constituent, Mr. Carl Sanders, of 206 Dogwood Street, Park Forest, Illinois, 60466-1823. His telephone number is (708) 747-1008.

According to Mr. Sanders, misinformation was provided in your letter dated August 20, 2007. Mr. Sanders provided a detailed response in his letter dated August 27, 2007. He requests that you kindly consider the information provided.

Please find attached information regarding this case. I respectfully request that you provide full and fair consideration to Mr. Sanders' request consistent with applicable law and regulations. In addition, please respond to my Director of Constituent Services, Ms. Annette de Caussin, at 17926 South Halsted Street, Homewood, Illinois, 60430.

Thank you in advance for your assistance and cooperation in this matter. I look forward to receiving your reply.

Sincerely,

Jesse L. Jackson, Jr.
Member of Congress

JLJJr.:Ad:ad

Enclosure

RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-1302
(202) 225-0773

2120 EAST 71ST STREET
CHICAGO, IL 60649
(773) 241-6500

17926 SOUTH HALSTED
HOMEWOOD, IL 60430
(708) 798-9000

EXHIBIT G

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED          )
PARTNERSHIP, a Michigan Limited     )
Partnership,                        )
                                    )
            Plaintiff,              )
                                    )
    v.                              )          No. 03-2209C
                                    )
UNITED STATES OF AMERICA, and       )          Judge Victor J. Wolski
MEL MARTINEZ, Secretary of the      )
Department of Housing and Urban     )
Development,                        )
                                    )
            Defendants.             )

DECLARATION OF CARL SANDERS

I, Carl Sanders, declare as follows:

1.    I have personal knowledge of and am competent to testify to the matters

set forth in this declaration.

2.    I have been employed in real estate sales and property management in the

Chicago area for 32 years in various positions including site manager, property manager, district

manager, area supervisor and associate director of property operations. Many of the properties

for which I had management responsibilities were in neighborhoods where gang activity and

drug crimes were epidemic and migrated into the properties. Security and access control are

critical in these situations. Residents have to be held to a legal standard with respect to

drug/crime activities, control of their children and guests and the destruction of property. There

are particular problems related to boyfriends, fathers and guests.

3.    Because of my experience with these types of properties, I was hired by

the P.M. One Management Company as an area supervisor beginning in September, 1996. I

147720_1.DOC

**Page 655**

assumed responsibility for South Pointe in March, 1998, and continued there through mid-April, 2001.

4.    I began my responsibilities at South Pointe by reviewing the files and visiting the property. I observed that site management and HUD oversight had allowed drugs dealers and gangs to control the property. The on site security guards had been either been intimidated or bribed by the drug dealers. There was little control over who had access to the building. Many tenants had relationships of one kind or another with the drug/gang interests. The elevators were routinely vandalized and broken. Gang graffiti was in the stairwells and corridors. Entry and bedroom doors and hardware were being broken as part of domestic conflicts. Kids played with the closet doors. Domestic fights led to damage to drywall.

5.    There were too many tenants with zero income, for which the HUD subsidy represented 100% of the rent. They had no investment in their unit. It was free.

6.    We had a difficult time evicting our problem tenants with drug/gang relationships. HUD made these evictions more difficult. When we started the eviction process, the tenant would call Ms. Thomas at HUD alleging some problem with management, the unit, etc. Ms. Thomas would call us to talk about the resident's complaint on the assumption that the resident was right and management was wrong. Ms. Thomas always started with the opinion that management was wrong. Residents quickly learned how to "game" the relationship between Ms. Thomas and onsite management. We had many problems of this type. In one instance, Ms. Thomas tried to intimidate me not to evict a tenant whose boyfriend had been arrested for selling drugs in the hallway of the building. After I stood my ground and asked Ms. Thomas to give me her concerns in writing, she had the tenant call HUD in Washington DC.

2

**Page 656**

7.     My review of the financial statements for the property revealed that the property was losing money. There wasn't adequate funding for proper security or evictions. In my experience, drug evictions usually lead to jury trials which take time and money that South Pointe did not have.

8.     Given the location of the building in Englewood, its size, its tenant make up and the lack of effective physical and operational security systems, South Pointe was an expensive building to operate.

9.     More than 85% of the property's income came from HAP payments. Only 15% of the overall rent was paid by the residents. Single mothers with large families were expensive to serve, and tenants who were relying almost exclusively on government rent subsidy often allowed their apartments units to be damaged by their families and guests.

10.     In the summer of 1998 South Pointe had been referred by Multifamily Housing ("MFG") to the Departmental Enforcement Center ("DEC"), a HUD department that specialized in difficult properties like South Pointe. HUD's Community Builder program was developed to give troubled projects access to city resources like rodent control, specialized police services (like the Violent Crimes Division), social services and all of the variety of services needed by a building like South Pointe and the families it was serving.

11.     South Pointe was one of the few Section 8 high rises in Chicago which had 3BR units and large 2BR units and was under a use restriction that required it to serve only "very low income" families. Under those restrictions it was a particularly expensive building to operate. There were more than 700 children at the building with no place to play, except for corridors, stairwells and the very limited common areas.

12.     DEC's Enforcement Analyst at South Pointe was Freddie Batchelor. She

3

had had experience with buildings like South Pointe. She did a comprehensive evaluation of all aspects of the project. She was serious and committed. We agreed that there was an immediate need to take control of the building, to reach out for the services of the Violent Crime Division of the City and to upgrade the security at South Pointe through the use of off-duty police officers, who were armed and had arrest powers. They were significantly more costly than security guards, but they were essential to our success in getting control of the building. Englewood and P.M. One had a very good working relationship with the DEC.

13.    It was clear to me that South Pointe needed a resident services program, to help residents access needed resources, and to provide recreational and social resources. We hired Kelly Brown, who had developed high quality resident services programs at the CHA Henry Horner development on the west side, and who had experience with the development and delivery of computer learning center services through a HUD Drug Elimination Grant at Northwest Tower, a somewhat smaller version of South Pointe in Chicago.

14.    Money was a constant problem from 1998 through 2001. South Pointe needed rent increases and access to supplemental and reimbursement funds to provide essential services, as well as the additional services for security, resident programs, and tenant damage to units. The DEC did not control the money. For all funding resources South Pointe had to apply to the MFH. In our case, that meant Ms. Thomas.

15.    In 1998, South Pointe had a cash deficit of $200,000. In March of 1999, and later in May, we requested a rental increase to pay for the increased cost of operations. We even proposed a reduction in the P.M. One management fee to demonstrate that we were interested in doing what we could to help the building financially.

4

16.    Ms. Thomas rejected the March, 1999 rental increase request because it was not the right "time." It was, however, the same time that the budget and rental increase request were made in 1998. Rejections of proper rental increase requests and special claims for losses related to tenant damage and vacancy became standard operating procedure for Ms. Thomas. She knew South Pointe was losing money and that Englewood was making advances to fund repairs and operations. However, for three years she never approved any of our requests for additional funding.

17.    The denial of South Point's 1999 rent increase request meant that the project lacked the resources to pay for normal operating expenses as well as the increased security and resident services. The owners were forced to make financial advances to fund operations as well as REAC repairs.

18.    When a tenant damaged an apartment and then vacated or was evicted, South Pointe was entitled to the costs of repairing the apartment as well as two months of vacancy rent payments. These are refered to as "special claims." South Pointe made special claims supported by appropriate documentation from 1999 through 2001. None of these claims were approved by Ms. Thomas. For example, our special claims which we prepared and sent to Ms. Thomas in March of 2000 did not get turned over to others at HUD until October, when they were denied for being too late and being incomplete. Clearly, from the time they were prepared in March, 2000, there was plenty of time to add backup materials, if needed, and to process and approve them in a timely manner. I learned that Ms. Thomas had no interest in processing claims.

19.    South Pointe properly completed applications for rental increases and submitted them to HUD in 1999 and 2000. All of the applications were denied.

5

20.    Ms. Thomas did not approve one rental increase or one special claim for South Pointe from 1999 through mid-April, 2001, despite the fact she knew the project was losing between $150,000 and $200,000 a year. We made regular requests for rental increases, special claims and the extraordinary gas costs for the winter of 2000/2001. All requests were denied. We were operating on 1998 rents against increased 2001 costs. The major problems at the building – enhanced security and additional maintenance and repair services – cost money the project didn't have.

21.    When the REAC and Pinnacle inspections were conducted in April and May of 1999 I requested copies of the reports right away so that we could begin work to remedy any cited deficiencies. I wrote to Joan Kiening at the DEC in mid-June of 1999 asking for the report so that we could be proactive in correcting the problems. We had started on the obvious work immediately. However, we wanted to get the full picture of the work HUD felt needed to be done so that we could develop an overall redevelopment plan that could be financed by our lender, the Community Investment Corporation.

22.    The REAC inspector allowed South Pointe to correct alleged EH&S deficiencies on the day of his April, 1999 inspection before noting them on the REAC report. South Pointe had no EH&S deductions from its REAC score in April 1999. South Pointe's REAC score appears to have declined between 1999 and 2001 because the inspector deducted 38 points for easily remedied deficiencies like missing switch plates and breakers from the 2001 score, deficiencies of a sort which were easily reparable and therefore not deducted from South Pointe's 1999 REAC score. If they were treated the same way they were in 1999, the 2001 REAC score would have been a 69.

6

23.    We developed a good working relationship with Ms. Batchelor and the DEC in responding to the 1999 REAC report to develop a correction strategy in June and July of 1999. The entire South Pointe staff had a number of meetings with Ms. Batchelor in the first half of 1999. We made good progress.

24.    All of us at South Pointe knew that a failure to implement the corrective actions which we proposed in response to the 1999 REAC Report could result in sanctions including the loss of South Pointe's HAP contract.

25.    Although South Pointe accomplished many of the necessary changes through maintenance repairs and work orders and owner advances, a rehab loan was clearly needed to complete the expensive repair work including the mail boxes, the elevator repair, drywall repairs and painting, and the entry and interior door replacement program.

26.    John Hayes wrote to HUD at my request in August, 1999 explaining our need for the confirmation of the 1999 HAP contract renewal and rental increase so that we could get additional financing from the Community Investment Corporation, our lender. If we could defer principal payments for one year, making a 10 year loan an 11 year loan, we could have access to $500,000 in what would otherwise be principal payments, which, with our renewed HAP contract, could finance the completion of the work needed to correct deficiencies identified on the 1999 REAC Report.

27.    On August 30, 1999 a high level Washington delegation came to South Pointe to assess our progress. They were impressed with our accomplishments. I thought it was a good time to write another letter to HUD asking for a confirmation of our 1999/2000 HAP contract renewal and a rental increase to cover our increased expenses.

7

Page 661

28.   In response to this visit, South Pointe received a letter from the DEC complimenting us for the good work we had done, the significant progress we had made and the favorable impression we made on the Washington visitors. The DEC could not renew the HAP contract or provide for a rental increase. The letter said that we would have to work with MFH, Ms Coleman and Ms. Thomas on the HAP renewal and rental increase.

29.   In October, 1999 we learned that the HAP contract was renewed for one year but that our request for the rental increase was rejected. The one year contract wasn't sufficient security for a private sector loan. The rejection of the rental increase simply meant South Pointe would continue to lose money for another year.

30.   South Pointe had to rely on advances from Englewood to fund both operating costs and the improvement program being developed in response to the 1999 REAC Report and Management Improvement Operations Plan ("MIO").

31.   On December 8, 1999, I drafted a MIO status report documenting and updating our progress in responding to the 1999 REAC Report. I followed the format that HUD had accepted for all of the other P.M. One properties in Chicago. It was a format that was accepted by everyone. The MIO update indicated that many repairs had been made, the mail boxes had been replaced, elevator work had begun, but that the elevators still needed to be repaired, and that we needed the rehab loan for the drywall and painting repairs, and the door replacement program.

32.   I learned from Freddie Batchelor in December, 1999 that the referral to the DEC was a success, that a Final Team Report Resolution had been approved, and that South Pointe would soon be transferred from the DEC back to MFH.

8

**Page 662**

33.     I was surprised that no one at MFH seemed to understand that they were supposed to be monitoring the MIO that had been approved in December, 1999. We were operating without clear connections to HUD. Ms. Batchelor at the DEC had largely completed their work. Ms. Thomas was not around. I would send in MIO updates. I would get no response.

34.     Ms. Thomas had very little to do with South Pointe for the first nine months of 2000. She visited the site briefly for a Management review in March, 2000. We didn't get the results of her report until mid-June, at which time she was already on a four month maternity leave. I responded fully and promptly to the Management Review on July 10, 2000. We didn't learn until October 3, 2000 that my response had been formally approved in what appeared to be part of the HAP contract renewal process.

35.     Louella Kirkman replaced Ms. Thomas as the Project Manager during the summer of 2000. We started mailing letters and reports to her, on the assumption that they would get routed to the proper parties in MFH or the DEC.

36.     I helped Mr. Hayes prepare and submit HAP contract renewal request and request for rental increase to HUD on July 27, 2000. We knew from conversations with CIC in the summer of 1999 that a multi-year HAP contract would be essential to the approval of the loan. A one year contract wasn't enough to give a lender adequate security for the repayment of a rehab loan. A lender wanted a multi-year contract in which there was guaranteed subsidy income from HUD. Our July 27, 2000 application was for a four year HAP contract.

37.     On October 3, 2000, Deb Gray and Ms. Thomas accepted our response to the 2000 Management review with specific language noting that there would be a future REAC review that would need to be satisfied.

9

38.    I didn't regard the REAC addendum to the 2000 HAP contract as a particular problem. There was still work to do on the existing MIO. The owner had advanced more than $770,000 to South Pointe in 1999 and 2000 in response to the 1999 REAC Report and DEC referral. We needed a refinancing. We needed to develop a 100% unit review and to update the needs of the building as part of our new rehab loan. We were developing a rehab plan that would complete all of the old MIO work as well as any new work uncovered by our comprehensive building review. The four year HAP contract would support a loan for all of the required repairs, and eliminate the $500,000 a year in principal payments that made up more than 20% of our operating budget. I clearly saw the multi-year HAP contract and rehab loan as the solution to all of our financial, physical and operational problems at South Pointe. The minimization of principal payments would give us the operating revenue needed to provide enhanced security, maintenance, repairs and resident programs. The refinancing would serve a number of important objectives.

39.    My understanding in early October 2000 was that the multi-year HAP contract had been approved. There was a meeting scheduled on October 18, 2000 to discuss the requirements of processing the rehab loan so that we were all on the same page. An architect had been retained. Ken Horton was hired by the PM Group to process the loan application. The purpose of the morning meeting that day was to discuss the HUD loan requirements. Ms. Thomas functioned as chair of the meeting. The rehab loan was the only topic discussed. Mr. Horton mentioned in passing that he had copies of the HAP contract signed by Englewood that needed to be signed by HUD. They were to be signed by Ben Teasler after the meeting. There was no discussion by Ms. Thomas, Ms. Coleman or anyone at HUD that there was any question about the multi-year HAP

contract. At the end of the meeting, Mr. Horton and I went to meet with Ben Tessler so that he could sign the contracts which Mr. Horton could take back with him to Michigan.

40.     At the meeting on October 18, 2000 there was absolutely no discussion of an "error" in the HAP contract. Ms. Thomas never mentioned it. Neither did Ms. Coleman. It was simply not discussed. We finished the meeting. Ken Horton and I met with Ben Tessler to have the HAP contract signed for HUD. We left with a signed contract. I was comfortable that we would get a rehab loan, complete the MIO, reduce our principal payments, or get them deferred for a year, so that we could pay for the security and utility costs and pay for repairs out of the rehab loan. HUD's idea that there was an "error" in the contract must have occurred at some later point in time. There was absolutely no discussion of it at the meeting on October 18, 2000, or at any time after the meeting. Neither Ken Horton nor I learned about it until the Veronica Coleman letter of December 6, 2000.

41.     I left the meeting on October 18, 2000, pleased that the rehab meeting went well and we had a signed HAP contract for four years which we could use to refinance the improvements we needed to finish off the work we were to do on the December 8, 1999 MIO, finance whatever new needs would result from our 100% unit inspections which were being done by both Ted Dunaj and on site management, and still have adequate revenue for security, resident services and the massive increase in heating costs projected for the winter of 2000/2001.

42.     If there had been any indication on October 18, 2000 that the HAP contract was to be for 3 months, or anything other than the contract that Mr. Hayes had signed, I would have immediately contacted Mr. Hayes. The rehab loan was essential to the completion of the MIO and our pressing accounts payable. The multi-year HAP contract was critical to the rehab loan. This was "the" issue we were concerned about South Pointe.

11

43.    As we discussed at the meeting on October 18th, I organized a 100% unit survey of the building the last days of October and the first days of November, 2000. The report resulting from this comprehensive inspection program indicated that physical conditions were significantly better than HUD's description of the property in the October 18th meeting. The units were not "deplorable." Some units had been badly abused by residents. That should have led to evictions, and damage and vacancy claims. But we didn't have the money to pay lawyers until we completed our refinancing. The units needed painting, the replacement of closet doors and various repairs. We felt all of the kitchen cabinets should be refinished. There were some repairs needed for toilets, tubs, floors, entry and interior doors and walls. Most units needed nothing other than normal work order requests. The repair needs of each unit were set out in a detailed spread sheet. The report indicated that 90% of the repairs were a result of tenant damage. The damages were concentrated in a limited number of units.

44.    There was a REAC inspection on March 2, 2001. The 13 EH&S items cited in the March 2, 2001 report were very minor, almost trivial: missing/broken outlet and switch covers, assumption about missing breakers, one situation where there were exposed nails in the drywall, a missing fire extinguisher inspection tag, etc. They could have been fixed while the inspector was on the site. That is what happened in 1999, and we received no EH&S deductions. If we had been allowed use 2-3 hours to correct the EH&S deficiencies on March 2, 2001, the day of the inspection, as we had been allowed to do in April of 1999, the South Pointe REAC score would have been a 69 and not a 31.

45.    I reviewed the EH&S list with the REAC inspector at the end of his visit on Friday, March 2, 2001. We talked about the other identified areas needing correction which could be found through work orders, that we could begin right away. We started to repair the

12

EH&S items immediately after the inspector left. We finished them on the morning of Saturday March 3, 2001. John Hayes was informed that the work was done on Monday, March 5, 2001. He wrote his letter to that effect on Tuesday, March 6, 2001.

46.  I learned on my normal weekly visit to Ft. Wayne on Wednesday, March 7th, that Ms. Thomas came out to South Pointe that day. Since we had completed the EH&S repairs on Saturday, I assumed the on site staff would show her what we had done. She was escorted by an assistant manager and a maintenance man. If I had been there, I would have gone down the EH&S list one-by-one to show her that all of the corrections had been made. I would have pointed out that the breakers Ms. Thomas later referred to were not operational, she was looking at a light fixture in the wrong maintenance room that was off limits to residents, and I would have made sure that Ms. Thomas went up into the penthouse to see the corrections there (something Ms. Thomas would not likely be able to do) and to make sure she saw the access to the exit in the trash room (something that Ms. Thomas declined to do). If there were any corrections that had to be made they could have been made right then within the 72 business hour REAC deadline.

47.  When I learned that Ms. Coleman had stated in her letter of March 9, 2001 that "some" set "not all" of the supposed EH&S items were corrected I went to the site, photographed the completed repair work, explained each deficiency in a memo, and sent it to my boss, Marlene Dan, so that John Hayes could have the documentary evidence to rebut these charges.

48.  During late March of 2001, since I had been with the REAC inspector during his visit on March 2, 2001, I helped John Hayes compare the scope of the work developed by Ray Etzkorn for HUD on March 27, 2001 of Ted Dunaj and BABCO, and the management

13

survey which I supervised in early November 2000. The EH&S work noted by Etzkorn was done in a matter of hours. All of the references to ranges and refrigerators, leaky faucets, clogged drains and repairs to bath and kitchen fixtures would be handled as normal maintenance work orders. The damage to entry and interior doors, closet doors and walls were results of tenant misbehavior. Under normal conditions they should have resulted in evictions and special claims. The Englewood proposal was to repair them through the rehab loan and then reestablish the security and resident services program that had worked well in 1999 and the first half of 2000.

49.    The Etzkorn proposal had some extremely impractical suggestions. Most obvious was its recommendation to replace the concrete penthouse. First, the removal of the concrete walls running two thirds the length of the building would have been almost an impossibility. Second, it would be a waste of money to spend $700,000 on it. Third, although the equipment in the penthouse needed to be moved and, in some cases, removed; it was unnecessary to demolish the structure to accomplish that.

50.    The Etzkorn proposal required the 100% replacement of cabinets, countertops, sinks, appliances, baths and kitchens. This was unnecessary. The March 2, 2001 REAC Report made no mention of countertops in any of the 25 inspected units. It called for the repair of one cabinet set. A few refrigerators needed new handles or gaskets. Some burners and ovens weren't working. Etzkorn recommended the complete replacement of existing features and upgrades like individual heating units, air conditioning and electrical upgrades. The recommendations were unrelated to the "findings" of the March 8, 2001 REAC Report.

51.    Almost all of the items listed in the March 8, 2001 REAC Report could

14

have been handled by work orders and two additional maintenance men, and special claims that should have been made against residents for the damages they caused to their units.

52.    I thought that the REAC Response consisting of the EH&S corrections, the list of corrections already made and the BABCO work proposal was a thorough response to the REAC Report. There needed to be selective drywall repairs in some units. All of the units needed to be repainted, along with the corridors and stairwells. Some toilets and tubs had to be replaced or reglazed. It was a good idea to refinish all of the cabinets and to replace bottoms or shelves where necessary. The Dunaj/BABCO work program was entirely consistent with the results of our four day unit inspection program in early November of 2000.

53.    The real problem at South Pointe was the need for money to pay for a first rate off-duty police security program to "take back" the building from the gang and drug interests, to design and implement a "get tough" eviction program so that the bad tenants who had damaged their units at South Pointe could be evicted, to pay for the extraordinary gas bills that materialized in the winter of 2000-2001 (more than double those of past years), and to complete the updated 2001 MIO program that had been developed by Englewood and P.M. One in response to the March 2, 2001 REAC report.

54.    There was a solid core of good tenants at South Pointe. There was also a very large population of good tenants living in Englewood that were very interested in getting Section 8 housing in a secure building with resident services. It would be simple to maintain 100% occupancy level for the building essentially by serving the needs of low income families in Englewood, the target market for which the building had originally been intended. All of the plans were in place to redevelop a financially solid South Pointe with tenants who would take advantage of the resident services programs that were offered, and who would work with

15

**Page 669**

Englewood and HUD to make the building the asset to the community, and the resource for affordable housing for Englewood residents that it was meant to be.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 30, 2005

CARL SANDERS

16